FILED
MAR 04 2013
United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 01-55137-ASW |
| SILICON VALLEY TELECOM EXCHANGE, LLC, | Chapter 11 |
| Debtor. | |

**MEMORANDUM DECISION FOLLOWING EVIDENTIARY HEARING**

This matter comes before the Court on a motion to compel Debtor to make plan payments, to appoint a receiver, or to convert the case to Chapter 7. Debtor Silicon Valley Telecom Exchange, LLC (hereafter, "Debtor") is represented by attorney Marc Pinckney. Movant Campeau Goodsell Smith (hereafter, "CGS") -- which represented Debtor in the bankruptcy case through confirmation of the Chapter 11 Plan -- is represented by attorney Gregory Charles. Movant Law Offices of David Tilem (hereafter, "Tilem") is represented by attorneys Bernard Greenfield and Marcia Gerston.

At the heart of this dispute, the parties disagree about the proper method for calculating payments due under the confirmed Plan. This Court has been asked to determine several related issues, including: (1) whether Debtor has complied with the terms

of Debtor's confirmed Chapter 11 Plan concerning payments to general unsecured creditors; (2) whether Debtor has complied with the terms of this Court's July 23, 2010 Order (hereafter, "the July 23, 2010 Order") on the parties' stipulation which clarifies Debtor's Plan payment obligations with regard to the general unsecured creditors; and (3) if Debtor has failed to comply with either the Plan or the July 23, 2010 Order, whether the Court should then convert the case to Chapter 7 or appoint a receiver to manage Debtor's business operations. Movants have also asked the Court to determine the appropriate method for calculating payments due to the general unsecured creditors under the Plan.

The Court held an evidentiary hearing.[1] After the hearing, the parties submitted written briefs in the nature of closing argument. The Court has considered the evidence admitted at the hearing, the written and oral arguments of counsel, and matters of which this Court may take judicial notice. For the following reasons, the Court finds that some relief is appropriate and will compel Debtor to make Plan payments, but the Court will not order appointment of a receiver nor convert the case to Chapter 7, as requested by CGS and Tilem.

I. Findings of Fact

   A. The Confirmed Plan

Debtor commenced this bankruptcy case under Chapter 11 on October 22, 2001. However, a Chapter 11 plan was not confirmed until almost six years later. On August 24, 2007, after a hearing,

---

[1] The evidentiary hearing occurred on several dates and was interrupted at the request of the parties so that they could engage in settlement negotiations.

the Court confirmed Debtor's Third Amended Joint Plan of Reorganization ("the Plan"). The Plan was a joint plan for three separate debtors: Rubio & Associates, Inc.; Silicon Valley Telecom & Internet Exchange, LLC ("SVTIX"); and Debtor Silicon Valley Telecom Exchange, LLC ("SVTX"). However, the Plan was confirmed only as to SVTX. Transcript ("Tr.") 179:21-25; 180:1-5.

The Court confirmed the Plan over objections from Tilem, as assignee of the claim of creditor Corporate Builders, Inc. (hereafter, "CBI"). The Court overruled Tilem's objections as untimely. The Plan's effective date was sometime in September 2007.[2]

**Plan Execution**

The Plan identifies the following means for the Plan's execution:

> The funds necessary to implement the Plan will be derived from Debtor's post-Petition business operations and/or from monies on hand.
>
> <u>Debtor's Business Operations</u>. The payments to be made to creditors under the Plan will be drawn from the proceeds of Debtor's operations. Debtor's expected operating results are set forth in Exhibit A to the Disclosure Statement, which is a pro forma income statement for the five year period of the Plan payments and which shows Debtor's anticipated financial condition from the Effective Date of the Plan. The projections anticipate that cash flow from operations after the Effective Date will be sufficient to meet Debtor's operating obligations and Plan obligations on an on-going basis. Debtor anticipates an increase in rents from lease of additional space available to SVTX as a result of Enron's termination of its leasehold

---

[2] In questioning Mr. Rubio, Mr. Charles stated that the Plan was effective on September 20, 2007. Tr. 83:21-25.

interest, and Debtor anticipates an increase in rents from lease of space available to SVTIX.

Plan at ¶ IX. The Plan also specifies when payments to creditors are due, as follows:

> **Quarterly Payment Dates**. The Plan provides for quarterly payments to claimants. Quarterly payments will be made within ten (10) days after January 1, April 1, June 1, and October 1 ("Quarterly Payment Date") of each calendar year after the Confirmation Date until claimants are paid in full as provided for by this Plan. The first quarterly payment will be made the first Quarterly Payment Date that occurs 90 days after the Confirmation Date.

Id.

If Debtor fails to make payments as required by the Plan, the Plan provides what will occur in the event of a default:

> **Default**. In the event that the Reorganized Debtor defaults in the performance of its obligations under this Plan, and shall not have cured such default within a period of ten (10) days after receipt of written notice of default from the holder of any allowed claim, then the holder of such allowed claim may pursue such remedies as are permitted by law. . . . If there is a material default under the terms of the plan and upon a successful post-confirmation motion to convert this case to a case under Chapter 7 of title 11, this plan shall terminate, and the Chapter 7 estate shall consist of all remaining property not already administered.

Id.

Under the Plan, the Court has retained jurisdiction to resolve any dispute regarding the interpretation of the Plan, to enforce and implement the Plan, to enter orders "in aid of consummation" of the Plan, and to modify the Plan under 11 U.S.C. § 1127, among other things not applicable to the instant motion. Id. at ¶ X.

## Required Payments Under Plan

The Plan requires Debtor to pay all allowed general unsecured claims[3] from multiple sources. These unsecured creditors are to share, on a pro rata basis, in the following: an Effective Date Payment of $50,000.00; distributions from Enron's Chapter 11 bankruptcy case,[4] including an amount of $192,302.74 already collected; and any preference recoveries. Significant to the instant matter, each creditor is also entitled to quarterly payments consisting of a "pro rata distribution of 80% of the net proceeds of Debtor's on-going operations, which payments shall continue until claimant is paid in full for the principal amount of its claim plus interest accruing at the Federal Rate." Plan at ¶¶ VI.D through VI.L.[5]

Debtor, CGS, and Tilem disagree as to the meaning of "net proceeds." In his testimony, Scott Goodsell[6] agreed that the term

---

[3] The Plan and Disclosure Statement identify the following holders of general unsecured claims: CB Richard Ellis, Granite Capital/Telegis, CBI, Verio, Inc., Fernando (aka Fred) and Karen Rubio, Michael Oaks, and NTT America. Debtor's Addendum to the Disclosure Statement filed August 17, 2007, identifies the amounts owed to each of the unsecured creditors, as follows: CB Richard Ellis ($65,435.09), Granite Capital ($102,245.52), CBI ($500,000.00), Verio, Inc. ($180,389.70), Fred and Karen Rubio ($0.00), Michael Oaks ($30,000.00), and NTT America ($30,000.00).

[4] Enron's involvement is discussed more fully infra.

[5] By contrast, the Addendum to the Disclosure Statement stated that the source of the payments will be "80% of the net profit of Plan Proponents' business operations (the remaining 20% of net profits will be held in a reserve account for payment of unanticipated expenses)." Addendum at p. 3, lines 4-8.

[6] In addition to being an attorney with CGS, Mr. Goodsell is also a Certified Internal Auditor. Tr. 146:18-21. Mr. Goodsell described this certification as being equivalent to a Certified Public Accountant. Tr. 146:19-25. However, CGS's attorney

(continued...)

"net proceeds from ongoing business operations" was a term drafted by Mr. Goodsell, and that the Plan does not define "net proceeds." Tr. 293:13-25. Prior to confirmation, Mr. Pinckney (then of CGS) agreed in open court at the hearing held August 24, 2007, that "profits" would mean "proceeds" under the Plan, but no such definition was ever incorporated.

It was CGS's attorneys who drafted the Plan and Disclosure Statement in this case. Tr. 186:22-25; Tr. 187:1-3. One of the primary authors of the Plan was Debtor's attorney, Scott Goodsell of CGS. Tr. 153:7-9. However, according to Mr. Goodsell, the Third Amended Plan was drafted by attorney Marc Pinckney, who at the time worked for CGS. Tr. 293:9-12.[7]

Complicating the absence of a definition is the fact that "net proceeds" is not an accounting term. Debtor's accountant, Laurie Orlando -- who testified that she has not seen the Plan -- stated that "net proceeds" is not an accounting term and therefore would need to be defined. Tr. 364:3-4; Tr. 366:1-3.[8] The absence of a clear definition of "net proceeds" was raised by Tilem in his

---

[6](...continued) declined to offer Mr. Goodsell as an accounting expert, after counsel for Debtor objected. Tr. 175:7-17.

[7] With regard to the main bankruptcy case, attorneys at CGS continued to represent Debtor through confirmation of the Plan until at least September 2007. Mr. Pinckney advised that CGS continued to represent Debtor in 2008 in Adversary Proceeding No. 08-5001. However, it was Mr. Pinckney -- not Mr. Goodsell -- who filed the interpleader complaint on January 2, 2008. At the time, Mr. Pinckney still worked for CGS.

[8] By contrast, Ms. Orlando testified that "net profit" is an accounting term, but did not define the term. Tr. 378:20-22; Tr. 379:14. Ms. Orlando also testified that the term "net income" is different from "net profit." Tr. 382:7-8 and 18-24; Tr. 383:16-21; Tr. 384:5-10 and 22-25.

objection to confirmation, but because the objection was untimely, the issue has not been addressed until now.

Even without a clear definition, the parties' attributed similar, but not identical, meanings to the term "net proceeds." Fred Rubio, II,[9] the principal, owner, and manager of Debtor, testified that the Plan required Mr. Rubio "to pay on a quarterly basis . . . the creditors, after looking at a cash basis, 80 percent of the net proceeds" and that "20 percent basically goes to a reserve account." Tr. 25:11-14; Tr. 51:8-21. Mr. Rubio also testified that he had discussions with his accountants, Ms. Orlando and Victoria Martini, to determine what the term "net proceeds" means. Tr. 26:24-25 and 49:1. Mr. Rubio understood that "net proceeds" were the "net profits after all expenses are paid" for a particular time period -- or "income minus expenses." Tr. 116:8-13. Mr. Goodsell agreed with Mr. Rubio's definition, and added that regular operating expenses should be subtracted from gross proceeds to obtain net proceeds. Tr. 160:13-17; Tr. 222:5-11. According to Mr. Goodsell, operating expenses would not include major renovations, improvements, or repairs. Tr. 163:16-12; Tr. 300:15-23; Tr. 465:23-25; Tr. 466:1.

The purpose behind the 80%/20% split in the Plan was to ensure that creditors would be paid, while at the same time setting aside some funds for the Debtor to use for improvements or repairs. Tr. 153:22-25; Tr. 154:1-4; Tr. 163:16-20. Debtor's Disclosure Statement,[10] including the Addendum thereto, explained that the

---

[9] Mr. Rubio's actual name is Fernando Rubio, Jr., but he uses the name Fred. Tr. 527:20-21; Tr. 528:18.

[10] The Disclosure Statement (or "DS") was entitled "[Third (continued...)

remaining 20% would be "held by Debtor as a reserve to pay for unanticipated but necessary building repairs or other expenses necessary for the preservation of Debtor's operations[.]" DS at p. 12, lines 9-12. Attached to the Disclosure Statement was a Cash Flow Analysis projecting quarterly payments ranging from $70,363.00 to $667,219.05 to the general unsecured creditors from the second quarter of 2003 through the first quarter of 2008. The Cash Flow Analysis did not project any major repairs or improvements. Mr. Rubio agreed that Debtor projected no capital expenses between April 1, 2006 and March 31, 2011, in evaluating Debtor's present value for purposes of the Disclosure Statement. Tr. 73:9-25; Tr. 74:1-13.

At the hearing, Mr. Goodsell testified that he did not believe that Debtor could make principal and interest payments to San Jose National Bank as part of Debtor's operations, and that payments toward principal could not be deducted before calculating net proceeds. Tr. 438:7-16. Mr. Goodsell believed that the meaning of "net proceeds" later changed such that the principal payments could not be deducted. Tr. 445:1-12; Tr. 446:1-2; Tr. 447:25 to 448:9. The Court finds such testimony to be disingenuous, at best, because it is contradicted by the Plan, drafted by attorneys at CGS, which requires Debtor to pay the principal obligation. The testimony is also contradicted by the Cash Flow Analysis submitted with the Disclosure Statement. The Cash Flow Analysis shows that Debtor anticipated the entire payment to San Jose National Bank -- along with other amounts paid, such as rent, insurance, taxes, utilities,

---

[10](...continued)
Amended] Disclosure Statement on Joint Plan of Reorganization."

landscaping, payroll, and similar expenses -- would be excluded before calculating the 80% amount payable to creditors. This treatment of the payment to San Jose National Bank, including the principal reduction payments, was fully disclosed to all creditors prior to confirmation. Regardless, the propriety of the payment to San Jose National Bank is not the central issue before this Court. Apart from the complaints made by CGS, there have been no other objections to these payments.

### B. Debtor's Business

Rubio and Associates, a business operated by Fred Rubio, II, leased a warehouse located at 250 Stockton Street, San Jose, California ("the Property"), from the San Jose Unified School District starting in 1999. Tr. 123:8-13; Tr. 255:2-6. In 1999, Mr. Rubio formed Debtor and became Debtor's managing member. Tr. 528:5-7 and 16-18; Tr. 529:9. Debtor took over the master lease[11] of the Property for purposes of operating a co-location facility on the premises. Tr. 180:7-12. According to Mr. Rubio, a co-location facility is a data center where different companies place their computer servers and sometimes outsource maintenance and management. Tr. 532:17-23. Debtor leased parts of the facility to various tenants, including Enron, Verio, and NTTA. Tr. 180:13-15. The master lease will expire in April or May 2019, but has a five-year option to renew. Tr. 598:22-24.

In 2000, Mr. Rubio formed SVTIX and became SVTIX's managing member. Tr. 528:24-25; 529:1 and 10-12. The purpose of SVTIX was

---

[11] At the hearing on November 22, 2011, Mr. Goodsell testified that the master lease "probably has about 10 years to run." Tr. 255:7-9.

to oversee the "meet me room," a large utility room where the carriers (such as AT&T, Verizon, and others) reside. Tr. 531:11-23; Tr. 534:7-11. SVTIX rents space on the first floor of the Property, colloquially referred to as "the basement." Tr. 181:3-11.

Mr. Rubio manages and operates Debtor's and SVTIX's business on the Property. Tr. 123:14-25; Tr. 124:5-19; Tr. 529:2-6. Mr. Rubio testified that Mr. Rubio was in charge of Debtor's day-to-day finances until the accountants took over that responsibility in September 2009. Tr. 59:20-22; Tr. 117:1-8. Mr. Rubio works in real estate, and is neither an engineer nor an accountant. Tr. 120:25 to 121:6-12.

It is Mr. Rubio's wife, Karen Rubio, who keeps Debtor's books, receives the rent and other income, writes and records checks, and calculates the quarterly Plan distributions. Tr. 529:18-25; Tr. 530:1-14. To accomplish these tasks, Ms. Rubio uses QuickBooks Pro, on which she has received some training. Tr. 602:11-19. However, Ms. Rubio is not an accountant and does not know definitions for all accounting terms, such as "amortization." Tr. 603:11-12; Tr. 615:24-25. Ms. Rubio recalled "glancing" at the Plan, but confessed that she has not read the Plan in depth and has not reviewed the amended Disclosure Statement. Tr. 617:7-14. Ms. Rubio testifed that in deciding how much money to pay to CGS under the Plan, Ms. Rubio had no instruction; instead, Ms. Rubio simply took the cash balance for the companies and subtracted "imminent expenses." Tr. 623:10-17.

Debtor pays a total salary to Mr. and Ms. Rubio of $15,000 per month. Tr. 258:21-25; Tr. 259:1-2. Debtor has also paid other

members of the Rubio family for work performed at the Property. According to Mr. Rubio, Starting in 2010, two of Mr. and Ms. Rubio's three sons -- Fred, Ryan, and Eric -- worked for the Debtor as Building Operating Center Technicians. Tr. 75:19-24; Tr. 76:23-25; Tr. 77:5-9. In that role, the sons performed "reboots" and "KVM," swapped hard drives, took down firewalls, and traced network cables. Tr. 76:1-3. At one point or another, all three of Mr. Rubio's sons worked for Debtor. Tr. 121:22 to 122:6. Mr. Rubio set his sons' rates of pay. Tr. 76:14-15. Some of the sons' high school friends also worked for Debtor performing landscaping and painting work. Tr. 77:16-20; Tr. 122:10-13. According to Mr. Goodsell and Mr. Rubio, Debtor also pays a woman named Jackie Fitzpatrick a fixed monthly commission to bring in new clients.[12] Tr. 127:14-25; Tr. 128:1-2; Tr. 259:12-16; Tr. 260:1-2. In 2008, the commission was $10,000.00 per month. Tr. 127:25; Tr. 128:1.

In 2001, one of the tenants at the Property -- Enron -- filed for Chapter 11 bankruptcy and rejected Enron's lease with Debtor. Tr. 181:17-22; Tr. 534:14-20. Enron vacated the Property and abandoned approximately $20 million in equipment, all of which was built into the Property. Tr. 534:17-20; Tr. 536:24-25; Tr. 537:1; Tr. 537:6-11. After Enron departed, SVTIX assumed responsibility for the operation of the Enron equipment. Tr. 540:6-9. SVTIX was unable to lease the entire space vacated by Enron, but was able to lease "lots and lots and lots of cabinets." Tr. 538:6-14. To the new tenants, SVTIX provided maintenance and management of the

---

[12] It was not clear from the testimony when Ms. Fitzpatrick began to work for Debtor. The commission paid to Ms. Fitzpatrick was not listed on the Cash Flow Analysis submitted with the Disclosure Statement prior to confirmation.

tenants' equipment, such as rebooting computers and performing an operation called "keyboard, video, and mouse" (KVM), which allows customers from around the world to monitor the customers' equipment from remote locations. Tr. 540:15-24; Tr. 541:7-19.

Mr. Rubio testified that Debtor made leasehold improvements at the Property in 2007. The improvements included building out the cabinets and racks, adding electrical infrastructure to some of the Enron rooms, bolting down the cabinets and ladder racking, and building up the data centers. Tr. 63:14-23.

According to Mr. Rubio, Debtor spent between $47,000 and $48,000 on cost of goods sold in 2007. Tr. 65:10-12. Mr. Rubio also testified that in 2008, 2009, and 2010, Debtor spent a bit more than $23,000, $18,000, and $20,000, respectively, on cost of goods sold. Tr. 65:13-18.

Mr. Rubio also testified about the difference between maintenance and repairs. Tr. 66:10-15. Mr. Rubio stated that maintenance pertains to maintaining existing electrical infrastructure, such as servicing the generators, the UPS,[13] and the electrical systems. Tr. 66:10-15. By contrast, a repair involves repairing an existing broken item, such as a broken pipe, a damaged fence, leaking batteries, or air conditioning systems. Tr. 66:10-15. Mr. Rubio further stated that repairs are not improvements. Tr. 67:1-2.

According to Mr. Rubio, Debtor spent $41,822.95 on contractors in 2007, $230,572.69 on contractors in 2008, $201,836.08 on

---

[13] UPS stands for "uninterrupted power supply." Tr. 542:2-5. Each UPS serves as a battery backup system which protects against losses caused by power outages. Tr. 128:22-24; Tr. 593:24-25; Tr. 594:1-3.

contractors in 2009, and $76,059.46 on contractors in the first half of 2010. Tr. 67:5 to 68:2; Tr. 70:11-19; Tr. 72:1-9. Mr. Rubio clarified that contractors were entities that were "building things at the building." Tr. 68:5-7. Mr. Rubio stated that the type of work performed by the contractors could be repairs, maintenance, or "new installs." Tr. 68:19-22. Ms. Rubio verified that contractor expenses included monthly service and maintenance contracts. Tr. 606:3-15.

Of the $41,822.95 spent on contractors in 2007, Mr. Rubio testified than none was spent on new infrastructure, but instead was used to expand the existing infrastructure in the Enron Data Center. Tr. 69:15-17; Tr. 70:11-24. In 2008, Debtor spent $230,572.69 on infrastructure improvements; Debtor bought a new UPS system and installed rows of cabinets, cages, and ladder racking. Tr. 69:18-19; Tr. 71:4-14; Tr. 72:1-3. The UPS system purchased in 2008 -- which Debtor referred to as "UPS Charlie" -- was installed in the summer of 2008 at a cost of $115,000.00. Tr. 542:24-25; Tr. 543:1-4 and 16-18. According to Mr. Rubio, once UPS Charlie was installed, there were customers who needed to use it, and UPS Charlie began to generate $33,000.00 per month. Tr. 543:5-13. Within a few months, UPS Charlie had paid for itself.

Between confirmation of the Plan and the end of 2008, Mr. Rubio agreed that Debtor performed speculative improvements to the building in the hope of attracting new tenants, which included a new transformer at a cost of $38,000.00, with a $26,000.00 installation cost. Tr. 128:16-21; Tr. 130:1-3. Mr. Rubio also agreed that Debtor replaced at least one UPS system at a cost of $28,000.00, plus $15,000.00 in installation costs. Tr. 128:22 to

129:12. Debtor also installed lighting ballasts outside because NTTA complained that women were being accosted in the parking lot. Tr. 129:13-21. According to Ms. Rubio, Debtor also had security expenses, which were the main item charged under the "consulting expenses" category. Tr. 604:12-14. Ms. Rubio also explained that the consulting category did not include expenses for construction of improvements, such as the installation of UPS systems. Tr. 604:21-25; Tr. 605:1-3. Instead, any large equipment purchases -- such as the UPS systems or replacement transformers -- would be charged as a fixed asset expense. Tr. 606:20-25; Tr. 607:1-5.

In 2009, Debtor spent $201,836.08 on infrastructure improvements on the air conditioning system, as well as on "walls in the power room in the basement." Tr. 69:20-23; Tr. 72:4-6. In the first half of 2010, Debtor spent $76,059.46 on infrastructure improvements. Tr. 72:7-9. Mr. Rubio also testified that Debtor purchased another UPS system -- "UPS David" -- in 2010 for approximately $115,000.00 to $120,000.00. Tr. 544:16-24; Tr. 545:2-3. However, Mr. Rubio stated that only 16 to 17 percent of UPS David was rented out to customers, because Mr. Goodsell told Mr. Rubio to cease spending money on construction in May 2010 to avoid violating the terms of the Plan. Tr. 545:12-24; Tr. 547:25; Tr. 548:1-6; Tr. 549:21-24; Tr. 550:17-23.

Mr. Rubio testified that without further construction, the remainder of UPS David could not be leased to customers. Tr. 551:5-14. Mr. Rubio also stated that Debtor ceased purchasing cabinets and power for UPS David, even though those costs would have been reimbursed by any customers. Tr. 553:18-25. Debtor purchased $22,000.00 in cabinets in April 2010, which allowed for a

portion of UPS David to be leased. Tr. 576:20-25. Slightly more than this amount was reimbursed through non-recurring charges to the customers. Tr. 577:12-15; Tr. 609:21-25. Mr. Rubio believed that if the construction had taken place, Debtor would have been able to lease all of UPS David. Tr. 554:20-22. In other words, Mr. Rubio believed that if Debtor had been allowed to build out UPS David, the construction would have paid for itself.

Mr. Goodsell testified that two of Debtor's "big footprint tenants" -- Verio and NTTA -- left the property in May 2010 and were never replaced with other "big footprint tenants." Tr. 243:1-5; Tr. 244:7-12. As a result, Debtor's revenues declined. Tr. 243:1-5; Tr. 258:7-20. According to Mr. Goodsell, the revenue stream from Verio and NTTA[14] was sufficient -- in fact critical -- to fund the Plan, but when Verio and NTTA left the Property, it became highly unlikely that creditors would be paid. Tr. 243:7-19.

Mr. Rubio acknowledged that rents dropped significantly after Verio and NTTA left the Property, and that Debtor needed to replace these rents in order to remain solvent. Tr. 556:20-24; Tr. 574:6-8. Verio had been paying monthly rent of $55,000.00, and NTTA had been paying monthly rent of $35,000.00. Tr. 557:6-21. In addition, both Verio and NTTA had paid a pro rata share of taxes, insurance, and other expenses. Tr. 557:6-21. Mr. Rubio explained that Debtor had been unable to attract tenants to the space left vacant by Verio and NTTA because of soil contamination located near diesel power generators, which was disclosed to Debtor in May 2010, and which Verio agreed to remediate. Tr. 558:4-15; Tr. 559:14-25;

---

[14] According to Mr. Goodsell, the revenue from Verio and NTTA was "probably 75 grand a month, maybe more[.]" Tr. 258:11.

Tr. 561:3-14. Mr. Rubio testified that some remediation was performed, but the Property is still not leasable because the San Jose Fire Department and Santa Clara County Health Services have not provided a closure letter stating that the Property is clean. Tr. 562:4-7; Tr. 565:7-25. Also, the diesel generators have not been inspected, and Verio and NTTA have been unwilling to perform any testing of the generators. Tr. 566:20-25; Tr. 567:16-24. According to Mr. Rubio, the soil contamination is the subject of a lawsuit now pending in federal court. Tr. 567:24-25.[15]

Both Debtor and SVTIX hired Ms. Orlando, a Certified Public Accountant, to prepare tax returns for tax years 2007, 2008, and 2009. Tr. 334:15-17; Tr. 335: 10-22. To prepare the returns, Ms. Orlando obtained balance sheets, income statements, and loan documentation from Karen Rubio. Tr. 336:6-11. According to Ms. Orlando, for tax year 2007, Debtor and SVTIX's combined income was $2,155,465.00, but the cost of sales and direct expenses were $1,315,785.00, after disregarding intercompany charges for rents and utilities. Tr. 355:5-7; Tr. 359:11-16. Similarly, for tax year 2008, Debtor and SVTIX's combined income was $2,530,079.00, with cost of sales and direct expenses of $1,608,281.00. Tr. 355:8-11; Tr. 359:17-18. For tax year 2009, Debtor and SVTIX's combined income was $3,330,676.00, with cost of sales and direct expenses of $2,045,262.00. Tr. 359:3-7 and 19-20.

---

[15] According to PACER, the district court case is Case No. 12-cv-00899-HRL, and remains pending.

### C. Payments to Creditors

CGS and Tilem are creditors. Tilem is a creditor of claimant CBI and thus claims to be a general unsecured creditor. By contrast, CGS is a creditor due to the attorney's fees owed by Debtor.

Approximately four months after the Plan was confirmed, on December 28, 2007, CGS filed an application with the Court seeking $1,238,814.68 for services performed and costs expended during the case. If approved, this would have brought the total fees paid in the case to $1,819,701.20, and the total expenses to $45,260.59. On March 19, 2008, the Court issued an order authorizing interim compensation to CGS in the amount of $400,000.00, to be split between Debtor, SVTIX, and Rubio & Associates. At a hearing held July 17, 2008, Debtor, CGS, and interested parties SVTIX and Rubio & Associates, agreed that the net fees and costs remaining to be paid by Debtor (SVTX) were $948,033.97 and $45,260.59, respectively. Debtor, CGS, and the interested parties also agreed that the fees and costs to be paid for the interpleader proceeding were $4,000.00 and $313.00, respectively. As of November 22, 2011, Debtor continued to owe CGS approximately $410,000 in fees. Tr. 253:23-25. That amount continues to accrue interest at the Federal Rate, as specified by the Plan. Tr. 254:1-4.

Mr. Rubio testified to his understanding that CGS is to be paid before any other creditor. Tr. 134:14-25 and 135:1-10. Mr. Goodsell confirmed that CGS's claim is to be paid "as an administrative claim" before any payment to unsecured creditors. Tr. 293:3-7. The parties filed a Joint Pretrial Statement in which

the parties stipulated to the following facts concerning Debtor's cash balances and amounts actually paid to CGS:

| Calendar Quarter Ending Date | Debtor's (SVTX) Balance Sheet Cash Balance | SVTIX Balance Sheet Cash Balance | Amount Paid to CGS |
|---|---|---|---|
| 12/2007 | $161,597.18 | $41,664.05 | $0.00 |
| 3/2008 | $40,017.90 | $85,072.39 | $87,268 on 2/15/08 |
| 6/2008 | $62,347.51 | $25,387.66 | $0.00 |
| 9/2008 | $82,255.87 | $43,429.54 | $0.00 |
| 12/2008 | ($48,433.90) | ($113,852.82) | $219,000 on 12/28/08 |
| 3/2009 | $98,195.83 | $45,296.57 | $0.00 |
| 6/2009 | $32,223.79 | $88,696.96 | $50,000 on 7/14/09 |
| 9/2009 | $96,770.48 | $13,476.00 | $19,500 on 10/30/09 |
| 12/2009 | $79,318.49 | ($46,324.24) | $198,159.06 on 12/29/09 and 12/30/09 |
| 3/2010 | $17,167.26 | $196,815.96 | $158,916.67 on 4/7/10 and 5/19/10 |
| 6/2010 | $596.14 | $15,996.43 | $13,274.05 on 7/8/10 |
| TOTAL PAID TO CGS | | | $746,117.78 |

It is Debtor's contention that calculation of the amount due to creditors should be premised upon a "balance sheet cash balance."[16] By contrast, CGS and Tilem assert that the calculation should be premised upon "reported SVTX cash basis profits." The parties' joint statement provides that the difference between these two methods is that Debtor's calculation includes checks which have been written but not yet presented to the bank for payment, while

---

[16] Mr. Rubio testified that he first heard the term "balance sheet cash balance" in the later part of 2009 from accountants Victoria Martini and/or Laurie Orlando. Tr. 115:16-19 and 116:1-2.

CGS and Tilem do not factor unpresented checks into the calculation.

Notwithstanding Debtor's assertion that the calculation of the amount due should be based upon the balance sheet cash balance, the above table shows that in most quarters, Debtor, together with SVTIX, paid CGS less than 80% of the balance sheet cash balance. However, there were quarters in which Debtor made a payment to CGS despite a negative balance sheet cash balance -- for instance, the quarters ending December 2008 and December 2009.

It is difficult to calculate the precise amount which Debtor should have paid to CGS, but the parties' data allow for an estimate. Based upon the parties' stipulated figures, the Court has calculated that if Debtor and SVTIX had segregated 80% of each balance sheet cash balance for CGS, the following amounts could[17] have been available to pay CGS:

| Calendar Quarter Ending Date | 80% of Debtor's (SVTX) Balance Sheet Cash Balance | 80% of SVTIX's Balance Sheet Cash Balance | Total Available for CGS |
|---|---|---|---|
| 12/2007 | $129,277.74 | $33,331.24 | $162,608.98 |
| 3/2008 | $32,014.32 | $68,057.91 | $100,072.23 |
| 6/2008 | $49,878.00 | $20,310.13 | $70,188.13 |
| 9/2008 | $65,804.70 | $34,743.63 | $100,548.33 |

---

[17] The Court qualifies this finding, because there were quarters in which Debtor posted negative balance sheet cash balances due to payments made to CGS during those quarters.