**Entered on Docket**
**March 04, 2013**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

| 12/2008 | NA[18] | NA[19] | NA |
|---|---|---|---|
| 3/2009 | $78,556.66 | $36,237.26 | $114,793.92 |
| 6/2009 | $25,779.03 | $70,957.57 | $96,736.60 |
| 9/2009 | $77,416.38 | $10,780.80 | $88,197.18 |
| 12/2009 | $63,454.79 | NA[20] | $63,454.79 |
| 3/2010 | $13,733.81 | $157,452.76 | $171,186.57 |
| 6/2010 | $476.91 | $12,797.14 | $13,274.05 |
| **Total** | | | **$981,060.78** |

The Court's calculation of the amount which might have been available to pay CGS is, necessarily, a rough one. However, if the Court were to adopt Debtor's position that the calculation of the amount due to CGS should be based upon the balance sheet cash balance, Debtor may have underpaid CGS by approximately $234,943.00 ($981,060.78 minus $746,117.78) between December 2007 and June 2010.

Mr. Goodsell testified that Debtor should have paid, but did not pay, the sum of $819,054.02 to CGS. Tr. 433:10-16. This figure appears on Exhibit 7 -- an exhibit which Mr. Goodsell compiled -- next to the heading: "Cumulative Monies Diverted from Creditors." Exhibit 7 specifically contains the following information regarding what Mr. Goodsell contends should have been

---

[18] There was a negative balance of $48,433.90 because Debtor paid CGS $49,000. Thus, in this quarter it would seem that Debtor paid CGS more than 80% of the balance sheet cash balance.

[19] There was a negative balance of $113,852.82 because SVTIX paid CGS $170,000.

[20] There was a negative balance of $46,324.24 after SVTIX paid CGS.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

allocated to creditors and to the reserve fund, and what amounts were actually paid:[21]

| Time Period | Net Income | 80% for Creditors/ (Amount Actually Paid) | 20% Reserve |
|---|---|---|---|
| Jan-Dec 07[22] | $113,992.45 | $91,193.96/(NA) | $22,798.49 |
| Jan-Dec 08 | $612,495.23 | $489,996.18/($306,268.00) | $122,499.05 |
| Jan-Dec 09 | $1,031,853.27 | $825,482.62/($267,660.06) | $206,370.65 |
| Jan-Jun 10 | $295,524.94 | $236,419.95/($158,916.67) | $59,104.99 |
| **Totals** | **$2,053,865.89** | **$1,643,092.71/($732,844.73)**[23] | **$410,773.18** |

The figures reached by Mr. Goodsell in Exhibit 7 are somewhat inflated and are premised upon suspect data;[24] therefore, the Court gives Exhibit 7 little weight. In compiling Exhibit 7, Mr. Goodsell attempted to "back out" or "add back" what he deemed were improper purchases. For instance, Mr. Goodsell included in "net income" any funds which Mr. Goodsell believed Debtor was not authorized to spend prior to the 80/20 split -- including funds

---

[21] The actual payout numbers are not correct. <u>See</u> Tr. 493:12-25 and 494:1-10.

[22] The data for Jan-Dec 07 are inaccurate and do not reflect the confirmation of the Plan, which occurred in August 2007. The 80/20 split did not go into effect until after confirmation.

[23] The $819,054.02 figure appears to be premised upon the following mathematical calculation: $1,643,092.71 (the 80% for creditors) minus $732,844.73 (the amount actually paid to creditors) minus $91,193.96 (the amount allocable to calendar year 2007).

[24] Mr. Goodsell compiled Exhibit 7 using information from Exhibit 5. However, Exhibit 5 was not admitted into evidence nor authenticated. When questioned about Exhibit 5, Ms. Rubio did not know who prepared it. Tr. 604:2-5; Tr. 649:17-19.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

actually spent on the UPS systems, approximately $105,000.00 spent on consulting, and approximately $230,000.00 spent on contractors[25] -- which Mr. Goodsell believed should have been purchased with the 20% reserve funds. Tr. 452:7-10; Tr. 453:18-25; Tr. 454:13-18 and 23-24; Tr. 458:1-5; Tr. 459:2-5; Tr. 474:13-20; Tr. 475:21-23; Tr. 476:19-25. However, Mr. Goodsell acknowledged that it was possible that some of the Debtor's expenditures, such as UPS Charlie, may have led to additional income, and that Mr. Goodsell included such income in the net figures. Tr. 453:18-25; Tr. 457:5-6. Mr. Goodsell also testified that any add-back likely would have been reduced or offset by any of Debtor's expenses which were reimbursed by customers. Tr. 461:6-23; Tr. 464:2-7.

Mr. Rubio testified that in determining how much money would be paid to CGS or to creditors under the 80/20 split provided for in the Plan, Mr. Rubio deducted amounts that were paid to contractors[26] before determining the percentages. Tr. 75:1-4. Mr. Rubio also stated that no distribution was made in January 2008 because there was a dispute as to CGS's fee application, and because Mr. Rubio needed to determine what amounts were needed to pay for taxes and insurance. Tr. 81:10-22; Tr. 91:5-12. Mr. Rubio stated that the funds were available to pay CGS, but Mr. Rubio did not place the funds in escrow. Tr. 92:5-7; Tr. 94:2-3 and 9-10; Tr. 96:13-16. Mr. Rubio acknowledged that the funds were used to

---

[25] Mr. Goodsell explained that the add-back for consulting and contractors included amounts paid for improvements, equipment, and repairs, but not amounts paid for ordinary expenses. Tr. 464:11-24; Tr. 475:21-23; Tr. 476:19-22.

[26] According to Mr. Rubio's testimony, at least some of the amounts paid to contractors included maintenance, in addition to repairs and installations. Tr. 66:9-15; Tr. 68:16-22.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

pay for "some unexpected expenses." Tr. 96:25 to 97:2. According to Mr. Rubio, when Debtor paid CGS at the end of 2008, Debtor's accounts were emptied. Tr. 95:17-18.

According to Mr. Goodsell, between May 2010 and November 2011, Debtor paid CGS approximately $15,000.00 to $20,000.00 in attorney's fees. Tr. 256:4-11. Mr. Goodsell projected that if Debtor's payments to CGS proceeded at the same pace, Debtor's debt to CGS would not be paid in full by the termination of the master lease. Tr. 255:10-13.

The Addendum to the Disclosure Statement projected that all unsecured creditors would be paid in full within three years or less of confirmation. Addendum at p. 6, lines 6-10. However, in the more than five years since confirmation of the Plan, Debtor has paid nothing to the unsecured creditors from Debtor's business income. Tr. 134:9-17; Tr. 135:12-18; Tr. 142:18-21. Rather, Debtor has disbursed payments to the unsecured creditors of all funds Debtor received from Enron. Tr. 607:6-16; Tr. 630:7-11; Tr. 639:2-9. Ms. Rubio believed that apart from the Enron money, no other money was to be distributed to creditors, regardless of how profitable Debtor's business was. Tr. 617:21-25. The total amount of the Enron distributions was not offered into evidence.

**D. The Motion to Compel**

On October 21, 2009, CGS filed a motion seeking to compel Debtor to make payments under the Plan, or seeking an order to appoint a trustee or receiver. <u>See</u> Tr. 144:4-10. According to the motion, Debtor failed to distribute funds in the manner required by the Plan. The motion was joined by creditor David Tilem, who represented creditor CBI, and also joined by creditor Randall Lamb

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Associates, one of four assignees of CBI's claim.[27] On November 9, 2009, Debtor filed a brief opposing the motion.

In May 2010, the parties agreed upon a methodology for calculating the payments due under the Plan. This agreement was later incorporated into the July 23, 2010 Order. The parties' agreement -- and the July 23, 2010 Order -- require Debtor to prepare quarterly balance sheets with three separate cash line item accounts: (1) a tenant prepaid rents liability account ("the Rents Account"); (2) a 20% reserve account ("the Reserve Account"); and (3) a general cash account ("the General Account").

The Rents Account was to reflect rents or license fees received by Debtor 30 or more days before the month for which the rent or fee was being paid. Such rents and fees would then be moved into the General Account. The Reserve Account was to reflect the cumulative unspent balance of the Reserve Account from the current and previous quarters, as well as customer and tenant reimbursements for expenses paid out of the Reserve Account.

Funds in the Reserve Account could be used for repairs or improvements to the Debtor's property located at 250 Stockton Ave., San Jose, California, could be transferred to the General Account to cover normal operations, or could be distributed to creditors. From the General Account, all ordinary expenses could be paid, as well as any individual repair costing $1,000.00 or less. Repairs costing more than $1,000.00 and any building improvements were to be paid from the Reserve Account.

---

[27] Randall Lamb Associates filed a joinder in CGS's motion on November 2, 2009, and filed another document reaffirming such joinder on April 27, 2011. However, Randall Lamb Associates did not participate in the hearing on the motion and has not submitted any argument papers of its own.

However, if there were insufficient funds in the Reserve Account to pay for a required repair, then funds from the General Account could be used, with immediate notification to be given to Scott Goodsell and Marcia Gerston.[28] If there were insufficient funds for a required building improvement, Debtor could request, in writing, the use of General Funds. Such building improvement would require advance approval of Scott Goodsell or Marcia Gerston. However, use of the General Account funds for a non-repair expense would otherwise be a breach of the Plan. Under the parties' stipulation, approval by Mr. Goodsell or Ms. Gerston "shall not be unreasonably withheld." See Joint Status Statement, p. 3.

The parties' agreement, and the July 23, 2010 Order, clarify that the quarterly distribution to the general unsecured creditors is to consist of 80% of the of the total in the General Account at the end of the quarter. In addition, Debtor is required to provide copies of quarterly profit and loss reports, quarterly balance sheets, check registers, and a report listing tenants and the amounts of prepaid rents by tenant in the Rents Account. The July 23, 2010 Order specifies that Debtor must provide such documents and reports to any creditor who has made a written request. Debtor is also required to maintain separate bank accounts for the Reserve Account and the Rents Account.

On July 15, 2010, CGS filed a status conference statement. According to CGS, Debtor's July 2010 payment to CGS in the amount

---

[28] Mr. Goodsell testified that Debtor could not make a major repair if there were insufficient funds in the 20% reserve account. Tr. 464:19-25; Tr. 465:1-25; Tr. 466:1. In so testifying, Mr. Goodsell made no mention of the possibility that Debtor could obtain approval to use non-reserve funds for a major repair. Perhaps Mr. Goodsell anticipated that any request for approval would be denied, but it is not clear from Mr. Goodsell's testimony.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

of $13,274.05 failed to comply with the parties' agreement. Based thereon, the Court set an evidentiary hearing to determine Debtor's compliance with the Plan.

Mr. Goodsell considered what it would cost to hire the equivalent of a trustee to manage the property each year and concluded that it would cost approximately $2,500 per month, or $30,000 per year. Tr. 256:22-25; Tr. 257:1-17. However, no specific evidence was offered on the actual cost of appointing any particular receiver or other person.

There is no evidence that Debtor failed to comply with the parties' agreement, or the July 23, 2010 Order, after July 2010.

## II. Conclusions of Law

There can be no serious dispute that, prior to the parties' stipulation as to the calculation of "net proceeds" under the Plan, Debtor did not make the required distributions to the general unsecured creditors. Whether Debtor is correct in its assertion that the calculation of net proceeds should have been on a "balance sheet cash balance" basis, or whether CGS and Tilem are correct in their assertion that the calculation should have excluded unpresented checks, is not an issue the Court needs to decide, partly because of the stipulation and the July 23, 2010 Order, but also for several additional reasons.

Even if Debtor were correct about how the calculation was to be made, Debtor failed to allocate 80% of the net proceeds under a "balance sheet cash balance" analysis to the general unsecured creditors. Using the parties' stipulated figures, Debtor's payments to CGS between December 2007 and June 2010 were short by more than $200,000.00.

Debtor's decision to use proceeds allocable to general unsecured creditors in order to purchase UPS Charlie and UPS David violated the Plan. These sizable purchases were made to expand Debtor's business to bring in new customers. Admittedly, UPS Charlie was profitable and paid for itself. UPS David might well have done the same, but Debtor did not complete construction on UPS David after being told by CGS to cease further construction. Profitability of a plan violation, however, is not the test.

Debtor's violation of the Plan was flagrant. The evidence unequivocally shows that Debtor completely disregarded its obligations under the Plan. After the Plan was confirmed, Debtor assigned all financial tasks to Ms. Rubio, who never read the Plan fully and simply glanced at it. Debtor also never shared a copy of the Plan with Debtor's accountants. In short, Debtor failed to take Debtor's Plan obligations seriously.

CGS and Tilem's closing briefs state that neither seeks a monetary award. CGS and Tilem ask this Court to appoint a receiver to manage Debtor's business operations going forward, or alternatively, to convert the bankruptcy case to Chapter 7. Tilem specifically requests appointment of Randy Sugarman to serve as receiver. Although CGS previously sought appointment of a trustee, CGS now acknowledges that it is no longer possible to appoint a trustee under Chapter 11, but asserts that the Court has authority under California law to appoint a trustee because the Plan can be treated as a final judgment under Fed. R. Civ. P. 69(a).

Debtor contends that neither remedy is appropriate within the context of this case. Debtor asserts that the remedies available to CGS and Tilem include suing Debtor for breach of contract, bringing an adversary proceeding to compel compliance with the

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Plan, or seeking conversion or dismissal of the bankruptcy case. Debtor argues that the Plan cannot be treated as a final judgment, that appointment of a receiver is not appropriate, and that neither CGS nor Tilem has presented a carefully drafted proposal for appointment of a receiver. Debtor also opposes conversion.

The parties are in agreement that conversion to Chapter 7 is an available remedy expressly contemplated in the Plan and under 11 U.S.C. § 1112(b). However, none of the parties prefers this remedy. At the hearing, the Court remarked to the parties that this case did not appear to be a Chapter 7 case. Debtor's tax returns through 2009 indicate that Debtor is profitable; the only issue seemed to be whether Debtor has been making the required distributions.

The question, then, is what other remedies exist. In Murdock v. Holquin, 323 B.R. 275, 282-83 (N.D. Cal. 2005) (Judge Ware), the district court stated that when a reorganized debtor defaults under the terms of a confirmed Chapter 11 plan, the creditors entitled to payment under the plan may assert an action for breach of contract in an appropriate court, or may request conversion of the case to Chapter 7 if there has been a "material default." The district court did not offer any alternative choices, but also did not purport to offer a conclusive list of options.

That confirmed Chapter 11 plans are viewed through a contractual lens was also the import of Miller v. United States, 363 F.3d 999 (9th Cir. 2004). In considering whether a tax debt was discharged under the plan, the appellate court observed that "[a] Chapter 11 bankruptcy plan is essentially a contract between the debtor and his creditors, and must be interpreted according to the rules governing the interpretation of contracts." Id. at 1004.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Case: 01-55137 Doc# 1159-1 Filed: 03/04/13 Entered: 03/04/13 16:07:47 Page 9 of 14

Interestingly, because the contract was ambiguous, the appellate court construed the ambiguous terms against the drafter -- the debtor -- "based on the interpretive principle that ambiguous contractual provisions are to be construed against their drafter." Id. at 1005-06. This is interesting because the drafter in the case at bar was not Debtor, but instead was Debtor's counsel. The argument could therefore be made that any ambiguity in the term "net proceeds" should be construed against CGS, the drafter of this disputed term.

However, it is not necessary for the Court to address the propriety of the remaining remedies sought by CGS and Tilem. Under the Plan, this Court has retained the authority to enforce and implement the Plan, and to enter orders "in aid of consummation" of the Plan. Under the unique circumstances of this case, the Court concludes that certain safeguards need to be put in place in order to ensure that Debtor complies with Debtor's obligations under the Plan.

Under 11 U.S.C. § 1107(a), a debtor-in-possession has certain rights and responsibilities. After confirmation of a plan, a debtor-in-possession shall "file such reports as are necessary or as the court orders[.]" 11 U.S.C. § 1106(a)(7). Here, because of the ambiguity in the Plan as to how payments should be calculated, Debtor has agreed to make payments in accordance with a stipulated methodology. The July 23, 2010 Order binds the parties to this methodology and already imposes a reporting requirement on Debtor. As stated earlier, the July 23, 2010 Order requires Debtor to prepare quarterly balance sheets which distinguish between prepaid rents, the 20% placed into reserve, and the 80% allocated to the creditors. Debtor also must provide quarterly profit and loss

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

reports, quarterly balance sheets, and check registers, as well as a list of tenants and prepaid rents. All of these reports are necessary to allow creditors to verify that Debtor is complying with the Plan, as clarified by the July 23, 2010 Order.

It is apparent that CGS and Tilem do not trust Debtor to apply the stipulated methodology correctly, and with good reason. Debtor's repeated violations of the Plan prior to entry of the stipulation, Ms. Rubio's lack of accounting expertise, Ms. Rubio's failure to understand the requirements of the Plan, and Debtor's failure to inform Debtor's accountants about the Plan's requirements undoubtedly led to this loss of confidence. In addition, CGS has offered evidence that Debtor paid CGS no more than $20,000.00 between May 2010 and November 2011 -- an undeniably small sum compared with Debtor's prior payments. The diminished payments to CGS could be explained by the loss of Verio and NTTA as tenants in May 2010. Importantly, the record is devoid of evidence showing that Debtor has incorrectly applied the stipulated methodology after July 2010.

Nevertheless, in light of Debtor's past Plan violations, caused largely by Mr. Rubio's lack of diligence in complying with the Plan and Ms. Rubio's lack of accounting sophistication and failure to understand the Plan's requirements, a prospective order compelling Debtor to make Plan payments is appropriate. From the date of this Order onward, Debtor shall make all payments required by the Plan in the manner clarified by the July 23, 2010 Order.

To aid consummation of the Plan, the Court orders that Debtor

shall employ, at Debtor's expense, a certified public accountant[29]
to ensure that Debtor's business operations and expenditures comply
with the Plan and with the July 23, 2010 Order. Such accountant
shall prepare and certify all of the quarterly reports required by
the July 23, 2010 Order, as being in compliance with the Plan and
such Order, and shall make and certify the required disclosures
which Debtor stipulated to make. The accountant shall also audit
Debtor's balance sheet and the accounting tasks performed by Ms.
Rubio or anyone else on behalf of Debtor, and shall certify that
accounting and distributions are, in the accountant's professional
opinion, in compliance with the Plan and the July 23, 2010 Order.
If, in the accountant's judgment, the accounting and other
financial work performed by Debtor (either through Ms. Rubio or
anyone else) is unreliable, the accountant shall prepare a written
explanation as to what is unreliable and why it is unreliable,
shall provide the written explanation to Debtor and any creditors
who requested written reports under the terms of the July 23, 2010
Order, and shall do the calculations him or herself. Debtor shall

---

[29] Debtor may employ any qualified, certified public accountant to perform these duties, including the accountants whom Debtor has employed to prepare tax returns.

cooperate fully and at all times with the accountant(s).[30]

**IT IS SO ORDERED.**

Dated: March 4, 2013

ARTHUR S. WEISSBRODT
UNITED STATES BANKRUPTCY JUDGE

---

[30] The Court has not ruled out the possibility that a receiver or trustee may be appointed. See Silverman v. Tracar, S.A. (In re American Preferred Prescription, Inc.), 255 F.3d 87 (2d Cir. 2001) (the bankruptcy court appointed a Chapter 11 trustee post-confirmation; the district court found this was improper because the plan did not allow such appointment, but the appeals court reversed the district court's decision on other grounds). The Court also has not ruled out the possibility of converting this case to Chapter 7 if Debtor should fail to comply with this Order or with the July 23, 2010 Order, or if Debtor should fail to make any required Plan payments in the future.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Court Service List

Silicon Valley Telecom Exchange
250 Stockton Ave.
San Jose, CA 95126

Marc L. Pinckney
4660 La Jolla Village Dr.
Fifth Floor, PMB 50077
San Diego, CA 92122

Gregory J. Charles
Law Offices of Gregory Charles
2131 The Alameda #C2
San Jose, CA 95126

Bernard Greenfield &
Marcia E. Gerston
Greenfield Sullivan Draa & Harrington LLP
55 S. Market St. #1500
San Jose, CA 95113

Courtesy Copies to:

Scott Goodsell
William Healy
Campeau, Goodsell Smith
440 N 1st St. #100
San Jose, CA 95112

David Tilem
206 N Jackson St #201
Glendale, CA 91206